**SBAITI & COMPANY PLLC**
MAZIN A. SBAITI
CA Bar No. 275089
Email: mas@sbaitilaw.com
GEORGE M. PADIS
CA Bar No. 288359
Email: George.Padis@sbaitilaw.com
Dallas Arts Tower
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
P: (214) 432-2899
F: (214) 853-4367

**SBAITI & COMPANY NJ LLC**
MATTHEW B. SICHERI
NJ Bar No. 256102018 (*Pro Hac Vice Forthcoming*)
Email: Matthew.Sicheri@sbaitilaw.com
100 Mulberry Street
3 Gateway Center, Suite 1102
Newark, New Jersey 07102
P: (973) 954-2000
F: (973) 954-9710

***ATTORNEYS FOR PLAINTIFF***

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.V., a Sex Trafficked Individual,<br><br>*Plaintiff*,<br><br>v.<br><br>AVALONBAY COMMUNITIES INC. D/B/A AVALON AT MISSION BAY; SOUTH BEACH MARINA APARTMENTS; ABC CORPORATIONS 1-100 (names being fictitious); and JOHN DOES 1-100 (names being fictitious),<br><br>*Defendants*. | **Case No.:  3:26-cv-88**<br><br>**COMPLAINT**<br><br>1)  **18 U.S.C. § 1595 *et seq.***<br>2)  **18 U.S.C. § 2421 *et seq.***<br>3)  **California Civil Code § 52.5**<br>4)  **Intentional Infliction of Emotional Distress**<br>5)  **Negligent Infliction of Emotional Distress**<br>6)  **Negligence**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

# I.

## PRELIMINARY STATEMENT

1.    Plaintiff A.V.[1] brings this civil action seeking damages against Defendants who were instrumental, if not necessary, participants in a sex-trafficking venture that took place just under a two-year period, starting when Plaintiff was a minor.

2.    Plaintiff did not turn 18 until mid-2019.

3.    This case seeks to hold accountable the apartment complexes and their respective shareholders, owners, security teams, and agents who benefited from the horrors inflicted on Plaintiff by knowingly providing the place and opportunity for her near-daily exploitation at the hands of her trafficker, Tom Roe, and Roe's associates.

4.    Plaintiff was forced into the life of involuntary sexual servitude as a minor, violence, and drug dependency by Tom Roe, a notorious sex trafficker. Tom Roe persistently threatened both Plaintiff and her family, and intimidated, manipulated, and drugged Plaintiff to keep her compliant.

5.    Tom Roe branded A.V. with a large tattoo on her inner thigh shortly after Tom Roe acquired Plaintiff and forced her into this trafficking ordeal; the branding tattoo was Tom Roe's way of claiming Plaintiff as his property. The other women that Tom Roe trafficked all had similar tattoos branded on them, with the design differing to identify each of his victims, including Plaintiff.

6.    Defendants, through their apartment complexes, owners, security teams, and agents, knowingly and repeatedly provided the venue for Plaintiff's exploitation, willfully turning

---

[1] A pseudonym is used because Plaintiff is a victim of sex trafficking and sexual abuse such that disclosure could lead to danger, stigma, or retaliation. *See infra* 2 and accompanying text.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

a blind eye to obvious signs of trafficking and, in many instances, actively facilitating the trafficking scheme because it was in their financial interest to do so. Defendants' actions and omissions enabled and perpetuated Plaintiff's victimization, for which they are liable under federal and state law.

## II.

## **THE PARTIES**

7.      Plaintiff A.V. is a citizen of California. Due to the sensitive, private, and demonstrably retaliatory nature of the allegations contained herein, Plaintiff requests this district court grant a protective order under Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym and to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit and thereafter.[2] Plaintiff also intends to file a formal motion to proceed under a pseudonym after completing service of the Complaint on Defendants so as to determine whether the Defendants would oppose Plaintiff's request to proceed under a pseudonym.

8.      Defendant AVALONBAY COMMUNITIES INC. d/b/a AVALON AT MISSION BAY was and is an apartment complex located at 255 King Street, San Francisco, California 94107, from about 2018 through 2019. Upon information and belief, at all relevant times, it was owned, operated, and maintained by Defendant AVALONBAY COMMUNITIES INC. d/b/a AVALON AT

---

[2] Tom Roe and his associates trafficked Plaintiff, starting as a minor, in October 2018 through 2019. In addition to being a victim of a "severe form[] of trafficking" as it is defined under 22 U.S.C.S. §7102(11), Plaintiff was also "caused to engage in commercial sex act[s]" for just under two (2) years. *See* 18 U.S.C.S. §1591(a). Federal law considers victims of sex trafficking to be the victims of organized crime, entitled to witness protection. *See* 18 U.S.C. §1594(g) ("witness Protection – Any violation of this chapter shall be considered an organized criminal activity or other serious offense for the purposes of application of chapter 224"). In cases where the plaintiff has demonstrated a need for pseudonymity, the district court should use its powers to manage pre-trial proceedings under Fed. R. Civ. P. 16(b) and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c) to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000) (recognizing the Ninth Circuit permits parties to use pseudonyms when disclosure of a name is "necessary…to protect a person from harassment, injury, ridicule of personal embarrassment); *Roes 1-2 v. SFBSC Mgmt., LLC*, 77 F. Supp. 3d 990 (N.D. Cal. 2015) (finding that a case involving exotic dancers because of the social stigma of such acts met the standards set by the Ninth Circuit to proceed under a pseudonym).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

MISSION BAY. They can be served with process via any legal means for service of process.

9.      Defendant SOUTH BEACH MARINA APARTMENTS was and is an apartment complex located at 2 Townsend Street, San Francisco, California 94107, from about 2018 through 2019. Upon information and belief, at all relevant times, it was owned, operated, and maintained by Defendant SOUTH BEACH MARINA APARTMENTS. They can be served with process via any legal means for service of process.

10.      Defendants ABC CORPORATIONS 1-100 and JOHN DOES 1-100 are unknown to Plaintiff at the time of filing this Complaint, and Plaintiff, therefore, sues said Defendants by such fictitious names and will ask leave of Court to amend this Complaint to show their true names or capacities when the same have been ascertained. Plaintiff is informed and believes, and therefore alleges, that each of the ABC Corporations and John Doe Defendants are, in some manner, responsible for the events and happenings herein set forth and proximately caused injury and damages to Plaintiff as herein alleged.

**III.**

**JURISDICTION & VENUE**

11.      This Court has original and supplemental subject matter jurisdiction over this matter under 28 U.S.C. § 1331, 18 U.S.C. § 1595(a), and 28 U.S.C. § 1367.

12.      This Court has personal jurisdiction over all Defendants because the natural persons reside in California or regularly conduct business in California, and because the trusts and business entities are "at home" in California, which is where they maintain their principal places of business or are incorporated. Moreover, each Defendant, through their apartment complex operations within California, purposefully availed themselves of the privilege of conducting business within California by doing business in California. For the reasons explained below, Plaintiff's claims arise out of or

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

relate to Defendants' contacts with California.

13.    Venue is proper in this District under 28 U.S.C. § 1391(b) because the Plaintiff was trafficked in this District, the acts giving rise to this action occurred in this District, and at least one Defendant resides and/or conducts business related to this action in this District and is subject to the Court's personal jurisdiction, § 1391(b)(1), (2), (3).  Moreover, the venue is proper within this District because the apartment complexes and apartment operations where Plaintiff was trafficked are within San Francisco County, which is within the Northern District of California. 28 U.S.C. § 84(a).

**IV.**

**BACKGROUND FACTS**

**A.  THE HORRIFIC ORDEAL AT DEFENDANTS' APARTMENT COMPLEXES (FACTS COMMON TO ALL DEFENDANTS)**

14.    Plaintiff's disturbing journey began when she was a child in high school. From about 2018 through 2019, Tom Roe and his affiliates forced her to have sex with strange men for money in the apartment complexes in California, named as Defendants in this action.

15.    Plaintiff was first forced into servitude to work for Tom Roe, a known organized crime member and sex trafficker, when Plaintiff was under the age of eighteen through her early months of adulthood.

16.    Plaintiff was mentally and physically abused by Tom Roe when she failed to perform and failed to make enough money. She was drugged with cocaine, marijuana, and occasionally Xanax to keep her dependent and compliant for Tom Roe and his associates.

17.    Plaintiff was threatened with serious physical harm, mental harm, and limited freedoms. Tom Roe also branded the inner thigh of Plaintiff with an uncorked bottle of Rosé wine

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

tattoo, which was tilted towards her genitals and splashing its contents towards her genitals. Tom Roe took Plaintiff to get branded at a tattoo parlor in Belmont shortly after Tom Roe began trafficking the Plaintiff.

18.    At all times, Plaintiff believed that if she did not perform the commercial sex acts and generate revenue, she would suffer severe physical harm, mental anguish, psychological harm, reputational harm, financial hardship, or consequences of the legal process. At all times, Plaintiff was reasonably afraid she would incur these injuries if she did not comply.

19.    Plaintiff was lured and groomed by Tom Roe to work for his sex-trafficking venture at the Defendants' locations through drug dependency and carefully crafted coercion.

20.    Tom Roe instructed Plaintiff on the pricing schedule and "the rules" for his venture. Tom Roe also asserted that when Plaintiff failed to make enough money or disobeyed Tom Roe, he would withhold drugs from Plaintiff. Tom Roe would constantly threaten Plaintiff with violence, threaten Plaintiff's family too, and continually dehumanize Plaintiff, making her feel less than human. Tom Roe was always armed with a gun that was used for further intimidation and control. When Plaintiff met the other tattoo-branded victims, the older female victim again explained "the rules" of Tom Roe's trafficking venture.

21.    The trafficking immediately began when Plaintiff was dropped off in the apartment with the other tattoo-branded victims; she was assigned her first customer to service that night.

22.    Within a couple of weeks of joining Tom Roe's sex-trafficking venture, Plaintiff was brought to a tattoo parlor in San Bruno, California, where she was branded with approximately a 10-inch champagne bottle on her inner thigh that splashed and pointed towards Plaintiff's genitals.

23.    The emotional distress and abuse that Plaintiff was forced to endure as Tom Roe dehumanized her, in view of all, including the Defendants and their agents, servants, and employees,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

caused the Plaintiff to slowly deteriorate mentally. The abuse was a means for Tom Roe to keep Plaintiff compliant for her forced participation in sex work.

24.    Each of the Defendants in this Complaint substantially participated in Plaintiff A.V.'s abuse, whether directly or indirectly, by assisting, supporting, and facilitating the commercial sex acts. Each of the Defendants in this case benefited financially from their participation, knowing or in willful blindness of the fact that she was being trafficked and compelled into a life of commercial sex servitude.

25.    Each of the Defendants named in this Complaint, including their agents, servants, or employees, contributed to the trafficking and abuse, both physical and mental, and allowed it to continue intentionally, or with willful blindness to or reckless disregard of the damage to Plaintiff and the other trafficked women, repeatedly sustained in the presence of the Defendants upon their premises, or who, at a minimum, turned a blind eye to it.

26.    Defendants' agents, servants, or employees specifically witnessed the abuse and the control Tom Roe and his associates exercised over Plaintiff.

27.    Tom Roe purposefully placed his trafficked women, including Plaintiff, at luxury apartment buildings to attract wealthier clientele. Tom Roe moved between apartments when another luxury apartment became available.

28.    Tom Roe brought Plaintiff to nightclubs and exclusive areas to meet wealthy individuals who would then be invited as clients back to the apartments.

29.    Tom Roe would pay his rent in cash, as well as pay the front doormen and security personnel to keep his trafficking venture running.

30.    Occasionally, the maintenance staff for the Defendants would be present when the trafficking occurred and would witness the commercial sex acts or exchange of payments while

working inside the unit.

31.     The Defendants' agents, servants, and employees were complicit in maintaining the trafficking venture as the occupied apartment was the headquarters of the trafficking operation.

32.     Tom Roe and his associates would send customers to the apartment for Plaintiff and the other victims to perform commercial sex acts.

33.     Men would walk into the apartment building without being stopped by the doormen or security, despite these men not living in the apartment building. Tom Roe would later come by every couple of days to collect the cash payments left by the men for the performed commercial sex acts.

34.     Therefore, the Apartment Defendants had knowledge of sex trafficking at their respective locations through their management, control, owners, and employees.

35.     Tom Roe employed fraud, drug dependency, and the threat of violence to force Plaintiff into performing commercial sex acts during all relevant times.

36.     Tom Roe controlled the money at all times. Plaintiff was at Tom Roe's mercy when it came to individual needs. The only thing Tom Roe would provide in sufficient quantities was the narcotic drugs on which he hooked Plaintiff but sometimes withheld to force Plaintiff's compliance.

37.     At all times, Plaintiff was afraid to leave. Tom Roe and his associates continued to degrade her to cause feelings of doubt and dehumanization to keep Plaintiff under Tom Roe's thumb.

38.     Plaintiff was only able to escape from Tom Roe after the Federal Bureau of Investigation conducted a sting and ultimately arrested Tom Roe, effectively ending his trafficking scheme.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**B.  THE APARTMENT COMPLEX DEFENDANTS' LIABILITY IS CLEAR**

**i.      COMMON ALLEGATIONS**

39.     As Plaintiff was a minor at the time the trafficking began and new to Tom Roe's sex-trafficking venture, the apartment lease was not in her name; the apartment lease was in the name of one of Tom Roe's more seasoned victims.

40.     Tom Roe would move Plaintiff and the other tattoo-branded victims to more luxurious apartments in the hopes of obtaining more high-scale clientele.

41.     Each Apartment Complex Defendant, along with their agents, servants, and employees, would have quickly become intimately familiar with Tom Roe, his associates, and his activities with Plaintiff and other women.

42.     Indeed, on information and belief, these Apartment Complex Defendants derive a significant portion of their revenue and profits from the sex trade at the relevant times in this Complaint. Upon information and belief, Tom Roe provided cash rental payments, as well as supplemental cash payments for their key employees' silence and involvement, directly to the Apartment Complex Defendants.

43.     Upon information and belief, each Apartment Complex Defendant utilized interactive computer service for things like rental payment recordings, maintenance requests, tenant complaints, inspection notes, tenant reviews and surveys, banking, and accounting, among other things.

44.     Thus, the Apartment Complex Defendants are part of a single informal conspiracy or, alternatively, a joint enterprise.

**ii.     SOUTH BEACH MARINA APARTMENTS**

45.     Upon information and belief, during the times Plaintiff was trafficked in the fall of

2018, the Defendant South Beach Marina Apartments (the "Townsend Apartments") owned the apartment complex that housed Tom Roe's trafficking scheme.

46.     The Townsend Apartments formed a business venture that participated in Tom Roe's sex trafficking scheme. The Townsend employees, agents, and servants involved in this venture included the front desk workers, security personnel, maintenance workers, and the property management team, all working within the scope of employment at the Townsend Apartments.

47.     At all relevant times, the Townsend Apartments had a continuous or repeat business relationship with Tom Roe, who was in charge of the rented apartment to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women, including Plaintiff, who were coerced into participating and thus were the victims of sex trafficking.

48.     The one-bedroom apartment on the second floor rented for Tom Roe's sex-trafficking scheme was placed in the name of Tom Roe's favorite trafficking victim. Tom Roe specifically selected the Townsend Apartments as it was considered a luxury apartment in San Francisco, California.

49.     Plaintiff shared the apartment with two other victims of Tom Roe's sex-trafficking scheme. One, a woman, would ensure Plaintiff's continued pliancy. The apartment was already rented prior to Tom Roe forcing Plaintiff to live there.

50.     The apartment was used as the headquarters of Tom Roe's sex trafficking scheme.

51.     Upon information and belief, monthly rent and service fees were paid with cash. The rent was approximately $7,500 per month.

52.     The Townsend Apartments had a front desk which was regularly manned by staff and security selected or hired by South Beach Marina Apartments. There were cameras.

53.     The customers would also go through the side door of the Townsend Apartments,

10

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

where both the front desk and security could have seen them via the many surveillance cameras.

54.    There was no way for the front desk or security personnel at the Townsend Apartments not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff, in addition to being underage, exhibited other obvious signs of being trafficked because:

    i.   The apartment was rented in the name of someone who had no reportable income that would have been sufficient to qualify for such an apartment under ordinary circumstances;

    ii.   The apartment housed multiple people, including unregistered tenants and a minor, and was frequented by non-resident guests—specifically, men;

    iii.   Tom Roe would frequently collect cash from the rented apartment and use part of the proceeds to pay the rent in cash to keep his sex-trafficking scheme going;

    iv.   Plaintiff was emaciated, rarely left on her own, and she was rarely able to speak with the employees, agents, or servants of the Townsend Apartments;

    v.   When Plaintiff was seen leaving or returning to the Townsend Apartments, she was typically dressed provocatively or in other form-fitting branded clothing;

    vi.   On each occasion, non-tenant visitors would regularly visit Plaintiff's apartment throughout the day, either walking in through the side door—visible on the security cameras—or by walking past the front desk and security personnel; and

    vii.   Plaintiff was typically visibly drugged and incapacitated when entering and exiting the Townsend Apartments and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity.

55.     Plaintiff would also come in and out of the Townsend Apartments' side door with clients in full view of the security cameras. Townsend Apartments' security monitored the side door on security cameras as they regularly needed to prevent people from entering the complex who might pose a threat.

56.     Tom Roe would regularly host several parties every week at the rented Townsend Apartment as a means to recruit additional young women and minors to his trafficking ring. During the day and non-party nights, Plaintiff and the others would use the Townsend Apartments to service customers to make the money for Tom Roe.

57.     The Townsend Apartments 'employees, agents, and servants would have seen a bunch of underage girls entering the rented apartment. for the nightly parties.

58.     The Townsend Apartments received financial benefits and other service fees from renting the subject apartment.

59.     The Townsend Apartments was responsible for the training of their employees, agents, and servants, including training them about the warning signs for sex trafficking within apartments or other similar transient locations, and having the control, either expressly or implied, over the hiring, control, and regulation of employees, agents, and servants of the Townsend Apartments.

60.     The Townsend Apartments, upon information and belief, had a tacit agreement with Tom Roe to allow their venture with Tom Roe and to continue participating in the venture and profiting from the exploitation of the Plaintiff and other women by Tom Roe at the Townsend Apartments.

61.     The failure of the Townsend Apartments to identify probable sex trafficking is due solely to their turning a blind eye to it, intentionally not taking measures to outline and train their

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

employees, agents, or servants, including the front desk and security personnel, how to spot sex trafficking, and then knowingly taking no action to ensure that those measures are deployed.

62.     Upon information and belief, the Townsend Apartments, via their property management obligations, regularly inspected, visited, reviewed, investigated, and maintained the apartment complex to assert compliance with all business standards and policies, even the sex-trafficking prevention policies.

63.     Upon information and belief, the Townsend Apartments did not so much as (a) ask their employees, agents, or servants questions as part of their reviews to identify whether they had seen any signs of prostitution or sex trafficking; or (b) survey the tenants of the Townsend Apartments' population and activities for the same purpose.

64.     These are reasonable steps that likely would have shut down the sex trafficking and prostitution within the Townsend Apartments, but the Townsend Apartments did nothing for eons.

65.     The Townsend Apartments participated in a venture with Tom Roe by permitting Tom Roe to continue his sex-trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through her constant physical and mental abuse in the presence of Townsend Apartments employees, agents, and servants, while continually profiting from Tom Roe's sex trafficking activity from the ongoing venture.

66.     The Townsend Apartments' lack of action permitted Tom Roe to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the Townsend Apartments could continue to profit. The Townsend Apartments' lack of action to stop Tom Roe and acquiesced participation in the venture have allowed Plaintiff and other trafficked women to be injured emotionally, mentally, and physically during their ordeal at the Townsend Apartments' location.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

67.     Furthermore, Defendant South Beach Marina Apartments' apartment complex venture and Defendant used interstate interactive computer services to pay rent, advertise open apartments, communicate with tenants and non-tenants, work orders and service requests, service fees, and general notices, among other things.

**iii.    AVALONBAY COMMUNITIES INC. D/B/A AVALON AT MISSION BAY**

68.     Upon information and belief, during the times Plaintiff was trafficked in late 2018, the Defendant AvalonBay Communities Inc. d/b/a Avalon at Mission Bay ("Avalon") owned the apartment complex that housed Tom Roe's trafficking scheme.

69.     The Avalon formed a business venture that participated in Tom Roe's sex trafficking scheme. The Avalon employees, agents, and servants involved in this venture included the front desk workers, security personnel, maintenance workers, and the property management team, all working within the scope of employment at the Avalon Apartments.

70.     At all relevant times, the Avalon had a continuous or repeat business relationship with Tom Roe, who was in charge of the rented apartment to knowingly facilitate—at a minimum— a scheme that they knew or should have known involved women, including Plaintiff, who were coerced into participating and thus were the victims of sex trafficking.

71.     Tom Roe, Plaintiff, and the other victims took over the lease from someone that Tom Roe knew was moving out; Plaintiff and the others were forced to move into the Avalon because Tom Roe believed it was more luxurious than the prior apartment.

72.     The apartment was rented for Tom Roe's sex-trafficking scheme and placed in the name of Tom Roe's trafficking victim. Tom Roe specifically selected the Avalon as it was considered a luxury apartment in San Francisco, California.

73.     Plaintiff shared the apartment with two other victims of Tom Roe's sex-trafficking

scheme; Tom Roe did not reside at this apartment and only regularly visited to collect the monies made by Plaintiff and the others or, upon information and belief, pay off the apartment staff. The apartment was used as the headquarters of Tom Roe's sex trafficking scheme.

74.    Upon information and belief, all monthly rent and service fees were paid with cash. The rent was approximately $10,000.00 per month.

75.    The Avalon had a front desk which was regularly manned by staff and security selected or hired by AvalonBay Communities, Inc.

76.    The front desk staff and security would regularly see Plaintiff and Tom Roe's other victims entering the apartment complex. They would have noticed that Plaintiff was a minor during part of her tenure at the Avalon.

77.    Upon information and belief, the front desk staff and security knew who Plaintiff and the other victims were and what was happening at Tom Roe's direction. The front desk clerk, security personnel, and even the maintenance staff would regularly watch and observe the Plaintiff and the others. Moreover, the security personnel and front desk staff instructed the Plaintiff and the others to hide their faces when bringing in customers, entering the apartment, or exiting the apartment.

78.    There was no way for the front desk or security personnel at the Avalon not to have noticed that Plaintiff was likely a trafficking victim. Plaintiff, in addition to being underage for part of her residence, exhibited other obvious signs of being trafficked because:

      i.    The apartment housed multiple people and was rented in the name of someone who would not have qualified for such rent;

     ii.    Tom Roe would frequently collect cash from the rented apartment and use part of the proceeds to pay the rent in cash to keep his sex-trafficking scheme going;

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

iii.  Plaintiff was emaciated, rarely left on her own, and she was rarely able to speak with the employees, agents, or servants of the Avalon;

iv.  When Plaintiff was seen leaving or returning the Avalon, she was dressed provocatively;

v.  On each occasion, non-tenant visitors would regularly visit Plaintiff's apartment throughout the day, either walking in through the side door—visible on the security cameras—or by walking past the front desk and security personnel; and

vi.  Plaintiff was typically visibly drugged and incapacitated when entering and exiting the Avalon and walking in its public areas—a telltale sign of sex trafficking—and it would have been obvious to anyone that she was incapable of consenting to any sexual activity.

79.    Plaintiff would occasionally be seen coming in and out of the Avalon side door or through the gym to bring up the customers. Upon information and belief, the security personnel monitored the side door and gym on security cameras. Upon information and belief, there were cameras in all common areas of the Avalon.

80.    While at the Avalon, Plaintiff and the other girls were entertaining clients when the maintenance team entered the Plaintiff's apartment. The Avalon maintenance team had to repair the dishwasher within the apartment. Upon information and belief, the maintenance team saw excess amounts of drug and sex paraphernalia, condoms, and lube throughout the apartment; the maintenance team also saw the multiple customers and the exchange of money for the services performed. The Avalon, despite the employees, agents, or servants knowing of the sex-trafficking, chose to do nothing or, at the very least, turned a blind eye towards Tom Roe's exploitation of

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1   Plaintiff and the others.

2        81.     The Avalon received financial benefits from renting the subject apartment and other

3   service fees.

4        82.     The Avalon was responsible for the training of their employees, agents, and servants,

5   including training them about the warning signs for sex trafficking within apartments or other similar

6   transient locations, and having the control, either expressly or implied, over the hiring, control, and

7   

8   regulation of employees, agents, and servants of the Avalon.

9        83.     The Avalon, upon information and belief, had a tacit agreement with Tom Roe to

10  allow their venture with Tom Roe and to continue participating in the venture and profiting from the

11  

12  exploitation of the Plaintiff and other women by Tom Roe at the Avalon.

13       84.     The failure of the Avalon to identify probable sex trafficking is due solely to their

14  turning a blind eye to it, intentionally not taking measures to outline and train their employees,

15  agents, or servants, including the front desk, maintenance workers, and security personnel, how to

16  

17  spot sex trafficking, and then knowingly taking no action to ensure that those measures are deployed.

18       85.     Upon information and belief, the Avalon, via their property management obligations,

19  regularly inspected, visited, reviewed, investigated, and maintained the apartment complex to assert

20  compliance with all business standards and policies, even the sex-trafficking prevention policies.

21  

22       86.     Upon information and belief, the Avalon did not so much as (a) ask their employees,

23  agents, or servants questions as part of their reviews to identify whether they had seen any signs of

24  prostitution or sex trafficking; or (b) survey the tenants of the Avalon's population and activities for

25  the same purpose.

26       87.     These are reasonable steps that likely would have shut down the sex trafficking and

27  prostitution within the Avalon, but the Avalon did nothing for eons.

28  

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

88.    The Avalon participated in a venture with Tom Roe by permitting Tom Roe to continue his sex-trafficking ring by forcing, coercing, and exploiting women, including Plaintiff, through her constant physical and mental abuse in the presence of the Avalon employees, agents, and servants, while continually profiting from Tom Roe's sex trafficking activity from the ongoing venture.

89.    The Avalon's lack of action permitted Tom Roe to continually force, abuse, and exploit women, including Plaintiff, to allow the venture to continue so that the Avalon could continue to profit. The Avalon's lack of action to stop Tom Roe and acquiesced participation in the venture have allowed Plaintiff and other trafficked women to be injured emotionally, mentally, and physically during their ordeal at the Avalon's location.

90.    Furthermore, Defendant AvalonBay Communities Inc.'s apartment complex venture and Defendant used interstate interactive computer services to pay rent, advertise open apartments, communicate with tenants and non-tenants, work orders and service requests, service fees, and general notices, among other things.

**IV.**

**CAUSES OF ACTION**

91.    All conditions precedent have been satisfied.

92.    All of the aforementioned factual averments in this Complaint are incorporated by reference within each of the following causes of action.

**A.  COUNT ONE: VIOLATION OF FEDERAL ANTI-TRAFFICKING STATUTE (18 U.S.C. §1581 ET SEQ.)**

93.    Plaintiff incorporates the factual averments in this Complaint as if fully set forth herein.

94.    Defendants have each (and among them jointly and severally) violated the Victims

18

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

of Trafficking and Violence Protection Act, 18 U.S.C. §1581 *et seq.* ("TVPRA"), and therefore are liable to Plaintiff for compensatory damages, punitive damages, attorneys' fees, and costs.

95.    The Victims of Trafficking and Violence Protection Act of 2000, Public Law 106-386, as amended, declares as illegal the trafficking in persons, including forced labor, involuntary servitude, slavery, and sex trafficking.

96.    In addition to being a victim of a "severe form[] of trafficking" as it is defined under 22 U.S.C.S. §7102(11), Plaintiff was also "caused to engage in commercial sex act[s]" before she turned 18. See 18 U.S.C.S. §1591(a).

97.    18 U.S.C. §1591(a) makes it a crime to knowingly benefit, either financially or by receiving anything of value from participating in a venture that engages the trafficking of children, or the trafficking of adults by force, threat or coercion. 18 U.S.C. §1591(a).

98.    18 U.S.C. §1593A specifically makes it a violation of federal law to benefit financially or receive anything of value from participating in a venture which has engaged in any act in violation of this chapter, with knowing or in reckless disregard of the fact that the venture has engaged in such violation.

99.    18 U.S.C. §1594 makes it a violation of federal law to attempt to or conspire with another to violate certain statutes, including 18 U.S.C. §1589, which criminalizes the obtaining of labor (or knowingly benefitting financially from participating in such a scheme when they knew or should have known of the trafficking) to obtain labor by a person by means of force, threats of force or physical restraint, serious harm or threats of serious harm, or the abuse of law or the legal process.

100.    18 U.S.C. §1590 makes it a violation of federal law for one to "harbor" any person for labor or services in violation of this chapter.

101.    22 U.S.C. §7102(12) defines "sex trafficking" as "the recruitment, harboring,

19

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act."

102.    To "participat[e] in a venture" for purposes of the violation means "knowingly assisting, supporting, or facilitating" sex trafficking where "knowingly" means with awareness of, willful blindness to, or being recklessly unaware. 18 U.S.C. §1591(e)(4). A violation of this section includes "[w]hoever knowingly… benefits, financially or by receiving  anything of value, from participation in a venture which has engaged in an act in violation of paragraph [(a)](1)." 18 U.S.C. §1591(a)(2) compare with 18 U.S.C. §1591(e)(4); see also 18 U.S.C. §1591(a)(1) ("Whoever knowingly … recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person…").

103.    18 U.S.C. §1594(g) also declares that any such scheme "shall be considered an organized criminal activity or other serious offense…"

104.    18 U.S.C. §1595 provides that Plaintiff may bring a civil action against each Defendant because each knowingly benefited, or attempted or conspired to benefit, financially or by receiving anything of value from participation in a venture that person knew or should have known had engaged in an act in violation of this chapter, and may recover damages and reasonable attorneys' fees.

105.    Each of the apartment ventures knowingly benefited financially and knew or should have known that Plaintiff was being trafficked for the purposes of having sex for money.

106.    They knew or should have known that she was not doing so of her free will and free from coercion—and their failure to know was the result of their own willful blindness.

107.    Each Defendant benefited financially in at least the following ways:

      i. Each Defendant apartment complex made money routinely for rental fees and

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

other assigned fees, which contributed to the business model of harboring sex-trafficking victims;

ii.   Each Defendant apartment complex was able to rely on a constant stream of income not just from Tom Roe's trafficking of Plaintiff and others and their other apartment rentals, but from the halo effect of others being a reliable source of income;

iii.  Each Defendant apartment complex benefited financially from realizing the benefit of their apartment asset being more valuable on a financial basis due to the income that was generated; and

iv.   Each of the Apartment Complex Defendants, along with their agents, servants, and employees, benefited financially from the rent and other fees that were paid as part of the above-noted financial benefits to the apartment complexes themselves, including the appreciation in the value of the overall apartment complexes or the Apartment Complex Defendant owner's goodwill, and the fact that the apartment complexes brand was being projected to the public through signage and other advertisements.

108.   There is no doubt that Tom Roe would not have been able to carry out his sex-trafficking scheme of Plaintiff without the participation of Defendants.

109.   Therefore, each Defendant is liable under Section 1595 of the TVPRA.

110.   Each Defendant apartment venture was using a facility or means of interstate commerce, such as interstate wire communications via the internet and banking system, and so owned, managed, or operated an interactive computer service for all facets of its business, including performing banking, lease management, tenant service requests, apartment assignments, apartment

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

availability, satisfaction surveys of tenants, tenant reviews and complaints, video surveillance in common areas, management of security personnel, and assignments for Defendant employees, agents, and servants, and communications with potential tenants and non-tenants.

111.    Each Apartment Complex Defendant promoted or intentionally facilitated prostitution in its apartments, renting apartments on varying terms and employing the staff who had to have known of Tom Roe's sex-trafficking operations, and accepting payment for them in the form of monthly rent and other fees, with full knowledge of what was occurring and did nothing to stop it or curb it; and if they were actually unaware that their actions contributed to the sex trafficking of Plaintiff, then they were willfully blind to and subjectively aware of the high probability that such prostitution was occurring.

112.    Plaintiff is entitled to damages she has suffered, including, but not limited to, her lost earnings and lost earning capacity due to the time she lost since she was first sex trafficked by Tom Roe; the fact that Tom Roe's sex-trafficking venture derailed the early stages and developmental years of Plaintiff's life; the fact that she was not able to make any money or have the chance to develop a career of her own and have a normal life and has been materially hindered by same; the fact that she now has to live with the fear, stigma, shame and mental anguish from being a sex-trafficking victim; and the pain, suffering, and physical scars of her plight, her extreme emotional distress, and her physical injuries.

113.    Plaintiff is further entitled to attorneys' fees for bringing this claim, as well as punitive damages and restitution.

114.    Plaintiff pleads that this action is timely as to all pleaded occurrences because the claims did not accrue until the last wrongful act and Plaintiff's incapacity and inability to bring a claim until she became free of Tom Roe's influence and threats which further tolls the statute of

limitations, and because Defendants are estopped from raising the statute of limitations as a defenses, and any statute is equitably tolled because Plaintiff was unaware of her injury.

**B.  COUNT TWO: CALIFORNIA CIVIL CODE § 52.5 (AGAINST ALL DEFENDANTS)**

115.    Plaintiff incorporates the factual averments in this Complaint as if fully set forth herein.

116.    Plaintiff is the victim of sex trafficking as defined in California Penal Code § 236.1, and is entitled to bring a claim under Cal. Civ. Code § 52.5(a), (b) and (c).

117.    Cal. Civil Code §52.5 incorporates Cal. Penal Code §236.1 as the predicate violation(s), and generally follows the same scheme set forth in the Federal Victims of Trafficking and Violence Protection Act. *See* Cal. Penal Code §236.1(g) ("The Legislature finds that the definition of human trafficking in this section is equivalent to the federal definition of a severe form of trafficking found in Section 7102(11) of Title 22 of the United States Code.").[3]

118.    Each Apartment Complex Defendant participated in Tom Roe's scheme, plan, or pattern of sex trafficking.

119.    Each Apartment Complex Defendant venture knowingly benefited financially and knew or should have known that Plaintiff was being trafficked for the purpose of having sex for money, Plaintiff was not doing so of her free will free and from coercion.

120.    Each Defendant benefited financially from Plaintiff's exploitation in at least the following ways:

          i. Each Defendant apartment complex made money routinely for rental fees and

---

[3] "The term 'severe forms of trafficking in persons' means—(A) sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or (B) the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 22 U.S.C. §7102(11).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

other assigned fees, which contributed to the business model of harboring sex-trafficking victims;

ii.  Each Defendant apartment complex was able to rely on a constant stream of income not just from Tom Roe's trafficking of Plaintiff and others and their other apartment rentals, but from the halo effect of others being a reliable source of income;

iii.  Each Defendant apartment complex benefited financially from realizing the benefit of their apartment asset being more valuable on a financial basis due to the income that was generated; and

iv.  Each of the Apartment Complex Defendants, along with their agents, servants, and employees, benefited financially from the rent and other fees that were paid as part of the above-noted financial benefits to the apartment complexes themselves, including the appreciation in the value of the overall apartment complexes or the Apartment Complex Defendant owner's goodwill, and the fact that the apartment complexes brand was being projected to the public through signage and other advertisements.

121.  There is no doubt that Tom Roe would not have been able to carry out his trafficking scheme of the Plaintiff without the participation of the Defendants.

122.  Each Apartment Complex Defendant facilitated prostitution in its apartments, renting apartments on varying terms and employing the staff that was intimately familiar with Tom Roe's sex-trafficking operations, and accepting payment for them in the form of monthly rent and other fees, with full knowledge that such prostitution or trafficking was occurring and did nothing to stop it or curb it, and if they were actually unaware that their actions contributed to the sex trafficking of

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff, then they were willfully blind to and subjectively aware of the high probability that such prostitution was occurring.

123.    Upon information and belief and based on the above-alleged circumstances, each Defendant was aware of or willfully blind to Tom Roe's and his accomplices' threats and violence toward Plaintiff in their apparent efforts to obtain Plaintiff's forced labor and in their efforts to restrict Plaintiff's personal liberty.

124.    Each Defendant is therefore liable to Plaintiff for the damages she has suffered, including, but not limited to, her lost earnings and lost earning capacity due to the time she lost since she was first sex trafficked by Tom Roe; the fact that Tom Roe's sex-trafficking venture derailed the early stages and developmental years of Plaintiff's life; the fact that she was not able to make any money or have the chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma, shame and mental anguish from being a sex-trafficking victim; and the pain, suffering, and physical scars of her plight, her extreme emotional distress, and her physical injuries.

125.    Plaintiff is further entitled to attorneys' fees and actual costs for bringing this claim, as well as treble damages, punitive damages, and restitution.

126.    Plaintiff pleads that this action is timely as to all pleaded occurrences because the claims did not accrue until the last wrongful act, Plaintiff's incapacity and inability to bring a claim until she became free of Tom Roe's influence and threats, due to the continuing tort doctrine, which further tolls the statute of limitations, and because Defendants are estopped from raising the statute of limitations as a defenses. Thus, Plaintiff's causes of action are timely under the doctrines of continuing tort, disability, equitable tolling, estoppel, and under California Civil Code § 52.5(c), (d), and (e).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**C. COUNT THREE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (ALL DEFENDANTS)**

127.    Plaintiff incorporates the factual averments in this Complaint as if fully set forth herein.

128.    At all times relevant, each of the Defendant apartment complex ventures acted through their agents, servants, and employees, and their acts and omissions were all in the scope of their employment or agency, including, but not limited to, door staff and security personnel.

129.    Because Plaintiff was a tenant within each apartment complex venture's respective apartment complex property, each Defendant had a duty of care to take reasonable precautions not to harbor or provide a safe haven for the sex trade and thus sex trafficking. Without limiting the generality of the foregoing, Defendants had a duty to:

  i.   Have knowledge of the signs of sex trafficking;

  ii.  Have an awareness of the degree of prostitution taking place within their apartment complexes;

  iii. Recognize when women or underage girls could be the victims of sex trafficking;

  iv.  Provide adequate incentives to apartment employees, servants, and agents not to acquiesce to or, worse, facilitate the sex trade within their apartment complexes;

  v.   Provide adequate training to apartment employees, servants, and agents to avoid facilitating sex trade businesses and prostitution in their complexes in states where prostitution is illegal;

  vi.  Properly train employees, agents, servants for dealing with suspected prostitution or sex-trafficking, including alerting law enforcement, in light of

26

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

the warning signs provided by government authorities and common sense;

vii.   Properly monitor and record the common spaces of their apartment complexes via cameras to ensure the safety of their tenants and non-tenants; and

viii.   Recognize when a tenant is under the influence of substances or otherwise incapacitated to the point of not being in control of themselves and, therefore, unable to escape or consent to any sexual activity.

130.    Each Defendant breached their duty.

131.    Each Defendant knew or should have known of the risks to Plaintiff.

132.    Each Defendant knew or should have known of the emotional distress and abuse suffered by Plaintiff, especially within her early developmental years, due to the force, manipulation, and exploitation by Tom Roe in the presence of each Defendant, or their agents, servants, or employees, in the sex-trafficking plan, scheme, or venture.

133.    At all times herein mentioned, Defendants and each of them knew of the regulations and laws cited herein, and knew that the well-being and health of their tenants and non-tenants alike were at risk whenever they failed to meet such duties.

134.    Each Defendant apartment complex venture knew or should have known that their routine failure to adhere to their duties created an unacceptable risk of severe injury and emotional distress to Plaintiff and others like her.

135.    Each Defendant's actions (whether directly or through their agents, servants, or employees) were done with knowledge of, reckless disregard of, or willful blindness to what was occurring to Plaintiff, and Defendants' employees' active participation in allowing Plaintiff to be used in the sex trade and sex trafficked is outrageous conduct. Defendants' conduct alleged herein demonstrates reckless disregard for or willful blindness to Plaintiff, her health and safety, and her

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

plight. Thus, Defendants' despicable conduct subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights.

136.    As a further result of Defendants' conduct, Plaintiff was forced to endure great pain, mental anguish, shock, humiliation, feelings of helplessness, and desperation at all relevant times, and continues to endure same.

137.    Each Defendant acted with reckless disregard of or willful blindness to the high probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was being subjected to Tom Roe's abusive conduct, both physical and emotional. Each Defendant was well aware of the propensity for abuse and violence taking place in their apartment complexes.

138.    Plaintiff has suffered severe emotional distress, beginning in her late teens and continuing into early adulthood, including humiliation, mental and emotional suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, and shame, and she continues to live with it and will likely have to live with it for the rest of her life. She lacks the means and insurance to seek proper treatment. Each Defendant's acts and omissions were a substantial factor in causing Plaintiff's severe emotional distress.

139.    Each Defendant's acts or omissions were the result of oppression or malice against Plaintiff because they were recklessly indifferent or willfully blind to Plaintiff's wellbeing.

140.    Plaintiff pleads that this action is timely as to all pleaded occurrences because the claims did not accrue until the last wrongful act and Plaintiff's incapacity and inability to bring a claim until she became free of Tom Roe's influence and threats, due to the continuing tort doctrine, which further tolls the statute of limitations, and because Defendants are estopped from raising the statute of limitations as a defenses. Thus, Plaintiff's causes of action are timely under the doctrines of continuing tort, disability, equitable tolling, estoppel, and under California Civil Code § 52.5(c),

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

(d), and (e).

141.    Plaintiff seeks all compensable damages, punitive damages, equitable relief, disgorgement, attorneys' fees, and actual costs of bringing this lawsuit.

**D. COUNT FOUR: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (ALL DEFENDANTS)**

142.    Plaintiff incorporates the factual averments in this Complaint as if fully set forth herein.

143.    Each Defendant owed Plaintiff a duty of care to take reasonable measures to ensure that she was not being subjected to potential trafficking and criminal abuse, including statutory rape, and other physical and mental abuse, on their premises. Each Defendant breached this duty.

144.    Plaintiff has suffered severe emotional distress, which was a foreseeable result of Defendants' actions or omissions.

145.    At all times relevant, each of the Defendant apartment complex ventures acted through their agents, servants, and employees, and their acts and omissions were all in the scope of their employment or agency.

146.    Because Plaintiff was visitor or a resident within each apartment complex venture's respective apartment complex property, each Defendant had a duty of care to take reasonable precautions not to harbor or provide a safe haven for the sex trade and thus sex trafficking.

147.    Without limiting the generality of the foregoing, Defendants had a duty to:

    i.   Have knowledge of the signs of human trafficking;

    ii.  Have an awareness of the degree of prostitution taking place within their apartment complexes;

    iii. Recognize when underage girls could be the victims of trafficking;

    iv.  Provide adequate incentives to apartment employees, servants, and agents not

to acquiesce to or, worse, facilitate the sex trade within their apartment complexes;

    v.   Provide adequate training to apartment employees, servants, and agents to avoid facilitating sex trade businesses and prostitution in their complexes in states where prostitution is illegal;

    vi.   Properly train employees, agents, servants for dealing with suspected prostitution or trafficking, including alerting law enforcement, in light of the warning signs provided by government authorities and common sense;

    vii.   Properly monitor and record the common spaces of their apartment complexes via cameras to ensure the safety of their tenants and non-tenants; and

    viii.   Recognize when a tenant is under the influence of substances or otherwise incapacitated to the point of not being in control of themselves and, therefore, unable to escape or consent to any sexual activity.

148.    Each Defendant knew or should have known of the risks to Plaintiff. At all times herein mentioned, Defendants and each of them knew of the need for the regulations and laws and that the lives and health of their tenants and non-tenants were at risk whenever they failed to meet such duties.

149.    Each Defendant apartment complex venture knew or should have known that their routine failure to adhere to their duties created an unacceptable risk of severe injury and emotional distress to Plaintiff and others like her.

150.    Each Defendant's actions (whether directly or through their agents, servants, or employees) were done with negligent disregard of what was occurring to Plaintiff, and Defendants' employees' outrageous conduct in allowing Plaintiff to be prostituted or sex trafficked. Defendants'

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

conduct alleged herein demonstrates negligent disregard for Plaintiff, her health and safety, and her plight.

151.    Thus, Defendants' despicable conduct subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights.

152.    Each Defendant acted with negligent disregard of the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was being subjected to Tom Roe's abusive conduct— physical, emotional, and mental. Each Defendant was well aware of the propensity for abuse and violence taking place at their apartment complexes. As a result of Defendants' conduct, Plaintiff was forced to endure great pain, mental anguish, shock, humiliation, feelings of helplessness at all relevant times, and continues to endure same.

153.    Plaintiff has suffered severe emotional distress, beginning in her late teens and continuing into early adulthood, including humiliation, mental and emotional suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, and shame, and she continues to live with it and will likely have to live with it for the rest of her life. She lacks the means and insurance to seek proper treatment.

154.    Each Defendant's acts and omissions were a substantial factor in causing Plaintiff's severe emotional distress.

155.    As a direct and proximate result of the acts or omissions of Defendants, Plaintiff sustained severe and serious harm, including, but not limited to, severe emotional distress, all to her damage in a sum within the jurisdiction of this Court and to be shown according to proof.

156.    Due to their negligence, each Defendant is therefore liable to Plaintiff for the damages she has suffered, including, but not limited to, her lost earnings and lost earning capacity due to the decade she lost since she was first sex trafficked by Tom Roe and the fact that she never had the

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma, shame and mental anguish of being a sex-trafficking victim; and her pain, suffering and physical scars of her plight, and her extreme emotional distress and physical injuries.

157.    All such damages are the foreseeable and proximate result of Defendants' acts or omissions.

158.    Each Defendant's acts and omissions proximately caused Plaintiff to suffer and continue to suffer anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame, such that an ordinary, reasonable person would be unable to cope with it.

159.    Plaintiff continues to have trouble obtaining work, sustaining herself financially, or assimilating into society after her horrific ordeal.

160.    Each Defendant's negligent acts or omissions were a substantial factor in causing Plaintiff's severe emotional distress.

161.    Plaintiff's causes of action are timely under the doctrines of continuing tort tolling, disability, equitable tolling, estoppel, and under California Civil Code § 52.5(c), (d), and (e).

162.    Plaintiff seeks all compensable damages, equitable relief, disgorgement, attorneys' fees, and actual costs of bringing this lawsuit.

**E.  COUNT FIVE: NEGLIGENCE (ALL DEFENDANTS)**

163.    Plaintiff incorporates the factual averments in this Complaint as if fully set forth herein.

164.    Each Defendant owed Plaintiff a duty of care to take reasonable measures to ensure that she was not being subjected to potential trafficking and criminal abuse, including statutory rape, and other physical and mental abuse, on their premises. Each Defendant breached this duty.

165.    Each Defendant also owed a duty to the Plaintiff to use reasonable care to ensure the

safety, care, wellbeing, and health of Plaintiff while she was on each Defendant's respective premises.

166.    Further, each Defendant's duties encompassed the hiring, screening, appointment, retention, training, or supervision of their employees that would otherwise provide a safe environment for Plaintiff at the apartment complexes owned, operated, controlled, managed, or maintained by the Defendants at their respective premises.

167.    Each Defendant knew or should have known from the open and obvious signs that Plaintiff was a victim of sex trafficking or a victim of each Defendant's participation in a venture with Tom Roe's sex trafficking scheme.

168.    Defendants breached their duty of care to Plaintiff and were negligent, grossly negligent, careless, or reckless for failing to protect the Plaintiff from their participation in the venture they engaged in with Tom Roe and failing to prevent Plaintiff's ordeal from continuing.

169.    Defendants knew or should have known based on the obvious and visible signs that the Plaintiff was being abused, assaulted, controlled, manipulated, drugged, forced, coerced, and otherwise exploited—sexually or otherwise—while at the Defendants' apartment complexes.

170.    Despite the Defendants' knowledge, either actual or constructive, regarding the sexual exploitation and trafficking of Plaintiff, Defendants took no remedial action, did not conduct a good faith investigation, or did not take any other actions whatsoever to ensure the health, safety, and wellbeing of Plaintiff on Defendants' premises.

171.    At all times relevant to this Complaint, Defendants had grossly inadequate policies and procedures to protect sex-trafficking victims, including Plaintiff, as well as to ensure a safe environment for the tenants of their apartment complexes.

172.    As a direct and proximate cause of Defendants' negligence, whether grossly

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

negligent, careless, or reckless, Plaintiff was sex trafficked, sexually exploited, physically abused, mentally abused, assaulted, and continually victimized at the Defendants' apartment complexes.

173.    The actions, omissions, commissions, or lack thereof, of each Defendant named in this Complaint (and among them jointly and severally) constitute negligence, and said negligence as outlined in this Complaint is the cause of Plaintiff's injuries and damages.

174.    Plaintiff has been injured and damaged under common law negligence, as well as all applicable state and federal laws, statutes, or regulations for negligence, due to the continual ordeal Plaintiff was forced to endure at the hands of each Defendant and Tom Roe.

175.    Additionally, in addition to the general claims of negligence in this count, to the extent that any Defendant is found not to be directly liable, they are liable for Counts One through Six under one or more of the following doctrines and theories of liability:

176.    **Aiding and Abetting**:

    i.   Each Defendant gave substantial assistance, comfort or encouragement to Tom Roe to perpetrate his scheme and violence against Plaintiff;

    ii.  Each Defendant, directly or through one or more of its employees, actively took part in Plaintiff's trafficking, or furthered it by cooperating with Tom Roe, or ratified and adopted his actions so that the ventures could make money, avoid detection, and continue as a business; and

    iii. Each Defendant's conduct was a substantial factor in causing harm to Plaintiff and perpetuating her trafficking because without the apartment complexes providing a lease for Tom Roe's venture, the sex trafficking would not have occurred.

177.    **Respondeat Superior/Vicarious Liability/Principal-Agent**:

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

i.  Each of the named Defendants herein, acting through their agents, servants, or employees, are liable for the acts and omissions of their agents, servants, or employees giving rise to liability.

ii.  For each of the respective Defendant apartment complex ventures described herein, the owners, employees and servants were the agents of each other, if not the employees of each other, and at all times were acting in the scope of their agency or employment;

iii.  For the apartment complex employees and agents, including the front door staff, maintenance workers, and security personnel, their tortious conduct is chargeable to the hotel owners because their acts or omissions were in the scope of their employment in a way that was inherent in their employment duties, and such conduct was a natural outgrowth of their employment duties under the risk-of-the-enterprise doctrine; and

iv.  The Defendants are vicariously liable for the acts or omissions of their own employees, agents, and servants, as well as their acts or omissions of their management employees of the apartment complexes.

178.  **Concerted Action:**

i.  The Apartment Complex Defendants are vicariously liable for the acts of omissions of their employees, agents, servants, and any vendors with access to the apartment complex under the theory of concerted action;

ii.  The Defendants, along with their employees, agents, servants, and applicable vendors, within each venture, worked towards a common goal of building and maintaining the apartment complex business at each respective location;

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

iii.   Each Defendant knew that they were engaging in and materially assisting a sex trade operation in their apartment complexes, which they knew or should have known could violate a duty of care owed to the Plaintiff; and

iv.   The Defendants intended to combine their relative property, skills, knowledge, and operations of the hotel for the purposes of carrying out a single business (namely, the franchised apartment complex business at issue); the Defendants had a relevant ownership interest in the apartment complex businesses; Defendants had a right to control the business—per all applicable management contracts and lease agreements, and the apartment complexes' management team controlled the day-to-day operations while Defendants' executives controlled the macro aspects of the business, and had the right to control of the apartment complexes business.

179.   As to each Defendant who contends they did not personally commit any of the acts that would give rise to liability, it is pleaded that said Defendant is liable through one or more of the above doctrines.

180.   Under the above doctrines and Negligence Counts, each Defendant is liable for Plaintiff's harm.

181.   Each Defendant's acts or omissions under one or more of the above doctrines and theories were a substantial factor in causing harm to Plaintiff and perpetuating Plaintiff's trafficking.

182.   Plaintiff's causes of action are timely under the doctrines of continuing tort, disability, equitable and continuing tort tolling, estoppel, and under California Civil Code § 52.5(c), (d), and (e).

183.   Plaintiff seeks all compensable damages, equitable relief, disgorgement, attorneys'

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

fees, and actual costs of bringing this lawsuit.

## V.

### **JURY DEMAND**

184.    Plaintiff requests a trial by jury on all issues triable to a jury.

## VI.

### **PRAYER FOR RELIEF**

185.    Plaintiff respectfully requests judgment in Plaintiff's favor awarding Plaintiff:

    i.    A protective order of confidentiality and sealing and protecting Plaintiff's identity;

    ii.    Actual damages in an amount to be determined by the trier of fact;

    iii.    Compensatory damages, whether direct or indirect, in an amount to be determined by the trier of fact;

    iv.    Punitive damages to be determined by the trier of fact;

    v.    Restitution and/or disgorgement in an amount to be determined by the trier of fact;

    vi.    Attorneys' fees and costs; and

    vii.    Any other legal or equitable relief to which Plaintiff is justly entitled.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    DATED: January 6, 2026                Respectfully submitted,

2                                          **SBAITI & COMPANY PLLC**

3
                                           */s/ Mazin A. Sbaiti*
4                                          **Mazin A. Sbaiti**
                                           CA Bar No. 275089
5                                          **George M. Padis**
                                           CA Bar No. 288359
6                                          3102 Maple Avenue, Suite 400
                                           Dallas, Texas 75201
7                                          T: (214) 432-2899
                                           F: (214) 853-4367
8                                          E: mas@sbaitilaw.com
                                           E: george.padis@sbaitilaw.com
9

10
                                           **SBAITI & COMPANY NJ LLC**
11

12                                         Matthew B. Sicheri
                                           NJ Bar No. 256102018
13                                         (*Pro Hac Vice forthcoming*)
                                           100 Mulberry Street
14                                         3 Gateway Center, Suite 1102
                                           Newark, New Jersey 07102
15                                         T: (973) 954-2000
                                           F: (973) 954-9710
16                                         E: Matthew.Sicheri@sbaitilaw.com

17
                                           **Counsel for Plaintiff**
18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL